**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

CARRIE GREGORY,

*Plaintiff-Appellee*,

v.

STATE OF MONTANA and
TOMEKA WILLIAMS, Probation
Officer,

*Defendants-Appellants*.

No. 22-35674

D.C. No.
4:20-cv-00051-
BMM

OPINION

Appeal from the United States District Court
for the District of Montana
Brian M. Morris, District Judge, Presiding

Argued and Submitted September 12, 2023
Seattle, Washington

Filed September 27, 2024

Before: Michael Daly Hawkins, Ryan D. Nelson, and
Daniel P. Collins, Circuit Judges.

Opinion by Judge Collins

## SUMMARY[*]

### 42 U.S.C. § 1983 / Sanctions

The panel reversed the district court's sanctions orders, reversed the verdict and judgment against Montana Probation Officer Tomeka Williams on Carrie Gergory's 42 U.S.C. § 1983 claim that Williams used excessive force during an encounter in a parking lot, vacated the award of attorneys' fees to Gregory, and remanded for a new trial on Gregory's excessive-force claim.

The relevant surveillance footage of the parking lot was auto-deleted. The district court found that the State acted recklessly in failing to take appropriate steps to preserve the surveillance footage before it was deleted, and—invoking its inherent authority—sanctioned the State by instructing the jury that it was established as a matter of law that Williams used excessive force against Gregory. The jury awarded Gregory $75,000 on the excessive-force claim.

The panel held that the district court committed legal error by relying on its inherent authority in imposing the sanctions because Fed. R. Civ. P. 37(e) governs both the loss of electronically stored information and the sanctions imposed in this case, and by its plain terms displaces the district court's power to invoke its inherent authority in imposing sanctions. Under Rule 37(e)(2), the conclusive adverse-determination sanction at issue here may be imposed only upon a finding that the party acted with the intent to deprive another party of the information's use in the

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

litigation. Because the district court's findings confirmed that no such intent was operative here, the sanctions were unlawful. Because the district court's error was prejudicial to Williams, the panel reversed the adverse judgment against Williams on the excessive-force claim, remanded for a new trial on that claim, and vacated the award of attorneys' fees to Gregory.

## COUNSEL

Paul Gallardo III (argued) and Daniel Flaherty (argued), Flaherty Gallardo Lawyers, Great Falls, Montana, for Plaintiff-Appellee.

Patricia H. Klanke (argued), Drake Law Firm PC, Helena, Montana; Paul R. Haffeman, Davis Hatley Haffeman & Tighe PC, Great Falls, Montana; for Defendants-Appellants.

## OPINION

COLLINS, Circuit Judge:

In this action under 42 U.S.C. § 1983, Plaintiff Carrie Gregory alleged that Defendant Tomeka Williams, a Montana Probation Officer, used excessive force on Gregory during a May 15, 2020 encounter that occurred in a parking lot adjacent to the Montana Department of Corrections Probation and Parole Office ("Probation Office") in the City of Great Falls. Despite Gregory's repeated efforts to ensure that the relevant surveillance footage of the parking lot would be preserved by the Montana authorities, the original

footage was auto-deleted from the recording system due to what the district court characterized as "recklessness on the part of the State in failing to take appropriate steps to preserve the recordings before they were deleted."[1]   The district court specifically found, however, that the State and its employees had not acted with either "gross negligence or willfulness."   Invoking its inherent authority, the district court sanctioned the State for its recklessness by instructing the jury, in the § 1983 claim against Williams, that "it has been established as a matter of law that Defendant Williams used excessive force against [Gregory] in violation of the Fourth Amendment of the United States Constitution during their encounter on May 15, 2020."  As to that § 1983 claim, the district court only submitted to the jury the questions of causation and damages.   The jury awarded $75,000 to Gregory on the § 1983 claim against Williams, but the jury ruled against Gregory on a related common-law claim against the State.   The court also subsequently awarded attorneys' fees to Gregory under 42 U.S.C. § 1988.

Williams and the State ("Appellants") appeal from the judgment against Williams, and from the sanctions orders against the State on which that judgment was based.  We conclude that the district court lacked the authority to impose the sanctions that it did.  By its plain terms, Federal Rule of Civil Procedure 37(e)(2) displaces the district court's power to invoke inherent authority in fashioning sanctions for the sort of failure to preserve "electronically stored information" that occurred in this case.   And under that rule, the

---

[1] As a result of the State's failure to preserve the original footage, the only copy that survived was a cellphone video of the relevant footage that, at Gregory's counsel's suggestion, a State officer recorded from a playback of the surveillance video on the State's system before it was auto-deleted.

conclusive adverse-determination sanction at issue here may be imposed "only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation." FED. R. CIV. P. 37(e)(2). Because the district court's findings confirm that no such intent was operative here, its sanctions were unlawful. Accordingly, we reverse the sanctions orders, reverse the judgment against Williams on the § 1983 claim, and vacate the attorneys' fees award.

# I

## A

Gregory's encounter with Williams in the Probation Office parking lot on May 15, 2020 arose from that office's supervision of her son, Daniel Gregory ("Daniel"). At the time, Daniel was being supervised by the Probation Office in connection with his deferred sentence for a conviction of assault with a weapon. Daniel was ordered to report to the Probation Office on May 15 after that office developed grounds to believe that he had possessed a firearm in violation of the terms of his supervision.

Specifically, on May 13, 2020,[2] Charlie Martin, a Montana Probation Officer who also worked a part-time job as a loss prevention investigator at a local sporting-goods store, observed a woman purchase ammunition at that store, exit the store and enter a pickup truck, and hand the ammunition to the male driver of the truck. The male driver then appeared to grab something from under his seat, and Martin concluded that he was loading the ammunition into a firearm. Martin thought that "the male driver looked familiar to me as being on supervision." He took down the

---

[2] The relevant transcript in the record actually says "October 13," but that is obviously an error.

truck's license-plate number, and the next day, at the Probation Office, he ran the number and discovered that the truck was registered to Daniel.  Daniel was being supervised by Probation Officer Heather Moore, who, coincidentally, was married to Martin.  Martin alerted Moore to what he had observed, and Moore attempted unsuccessfully to locate Daniel.  The next morning, on May 15, 2020, Daniel called Moore and asked why she had been looking for him.  Moore told him that she was investigating a suspected violation of his supervision terms and that he needed to report to the Probation Office immediately.  Daniel said he would be there within 15 minutes.

About an hour later, Daniel parked his truck in the lot adjoining the Probation Office.  Another vehicle immediately followed him into the lot, and Daniel exited his truck and got into the passenger side of the second vehicle. Moore watched the exchange from the Probation Office and then walked into the parking lot accompanied by several other probation officers, including Williams, as well as officers from the Great Falls Police Department, including Scott Fisher.  The officers approached the vehicle, and Moore directed Daniel to get out of the car and raise his hands.  As Moore did so, the driver of the second vehicle, who was Gregory, stepped out of that vehicle.

The parties dispute what happened next.  According to Williams, Gregory disobeyed several instructions to stay back from the officers as they arrested and handcuffed Daniel.  Williams asserts that, sensing a "threat approaching," she placed herself between Gregory and the other officers, but that Gregory "continued to take small steps forward."  Williams states that, to prevent Gregory from coming any closer, Williams used two hands to push Gregory in her chest, away from the officers.  According to

Williams, Gregory then began "flailing at," "hitting," and "scratching" Williams. Williams allegedly sustained bruises and other injuries as a result. According to Gregory, however, she did not hear any commands from Williams and was observing Daniel's arrest at a distance when Williams approached her and, without any prompting, violently lifted and twisted her left arm. Gregory alleged that the force bruised and fractured her left elbow and severely injured her left wrist. It is undisputed that, after the encounter between Williams and Gregrory, Fisher handcuffed Gregory and placed her into a police car.

The entire encounter was captured by an external surveillance camera that monitored the parking lot and that was operated by the Probation Office.

**B**

As a result of the incident, the City charged Gregory with misdemeanor obstruction of a peace officer in violation of Montana Code Annotated § 45-7-302(1). Four days after the incident, Gregory's retained defense counsel, Dan Flaherty, called Wayne Bye, Deputy Chief for Region 3 of the Montana Department of Corrections, to request the relevant May 15, 2020 surveillance footage of the parking lot. Bye responded that he "would do [his] best to get [it]," but warned that the surveillance system was "old." Flaherty suggested that Bye record a copy of the footage with his cellphone, which Bye agreed to do. Later that day, Flaherty followed up with an email addressed to Bye and Neil Anthon, the chief prosecutor for the City, memorializing his request for the footage.

While Bye had some experience with reviewing footage from the internal surveillance system that monitored the inside of the Probation Office, he had no experience with

preserving footage from the external surveillance system that monitored the parking lot.  Bye knew that the internal surveillance system preserved footage for up to "two to three months."  He did not check the retention policy for the external surveillance system, however, and simply assumed that the May 15, 2020 footage was subject to a standard 30-day retention period.  As it turned out, the footage was actually subject to only a 17-day retention period.

On May 21, 2020, two days after his phone call and email requesting the footage, Flaherty followed up with another email asking Bye to preserve the now almost week-old footage, expressing concern about how long the external surveillance system would retain it.  The next day, Bye asked another probation officer, Tim Hides, to assist him with preserving the footage.  Bye and Hides first planned to burn the footage from the external surveillance system onto a CD, but they were unable to do so, due to the fact that the power cord for the CD burner had been misplaced.  As an alternative, Bye and Hides recorded two copies of the footage using Bye's state cellphone.  The pair then dropped off "disk copies" of the cellphone recording at Flaherty's and the City Attorney's offices.

On May 26, 2020, Flaherty reviewed the cellphone recording and concluded that the quality was too poor to clearly make out what was depicted.  Flaherty reached out to Bye, asking if Flaherty could transfer the original footage onto his flash drive or laptop.  Bye explained that applicable state policy prohibited any such connection of a private external device to a state computer.  Instead, Bye purchased a new power cord for the CD burner, and he and Hides then attempted to burn the footage onto a CD.  However, when they made that attempt, either on May 27 or 28, they discovered that "the files were too large to put on the CDs."

On either June 2 or June 3, Bye and Hides tried instead to transfer the footage onto state flash drives.  Because that was now more than 17 days after the footage was recorded, the surveillance system had already automatically deleted the footage.  Bye promptly informed County Attorney Josh Racki of the loss of the footage.

On June 10, 2020, Racki informed Flaherty that the footage had been lost.  Soon thereafter, the City dropped the misdemeanor charge against Gregory.

## C

On June 19, 2020, Gregory sued Bye, Williams, Fisher, the State, and the City.  Gregory's operative complaint asserted a variety of causes of action against multiple defendants, but by the start of trial only three claims remained: (1) a § 1983 claim against Williams for excessive force during the May 15, 2020 incident; (2) a state-law claim against Williams for assault and battery; and (3) a state-law claim against the State for negligent infliction of emotional distress.

Gregory filed a motion for sanctions against the State based on its loss of the May 15, 2020 surveillance footage.  In her motion, Gregory asked the district court to grant her a default judgment and to do so pursuant to the court's inherent authority, rather than under Rule 37.  After receiving additional briefing on the propriety of applying sanctions with respect to a § 1983 claim asserted only against Williams, the district court ultimately granted the motion for sanctions in part.  The court rejected Gregory's request to enter a default judgment.  Instead, invoking its inherent authority, the court stated that it would instruct the jury that it was established that "Officer Tomeka Williams used unreasonable force in the seizure of Carrie Gregory,"

and the court further held that it would bar any testimony about the lost footage's content, as well as Bye's cellphone recording of the footage. The court would, however, submit to the jury the issues of causation and damages, as well as the question whether Williams acted with malice warranting punitive damages. The court acknowledged that its decision "effectively grant[ed] summary judgment to Gregory on the issue of unreasonable force," but the court concluded that this sanction was nonetheless warranted. In making its assessment as to the propriety of the sanction, the court expressly found that "Gregory cannot sustain her burden to establish gross negligence or willfulness on the part of the State" and that the State's conduct amounted only to "recklessness." The court also rejected Williams's arguments that it would be unfair to effectively impose a sanction on her when it was the State that had lost the footage.

On March 21, 2022, the case proceeded to trial. About an hour before opening arguments, Gregory objected to the defense's stated intention to present the testimony of six parole officers who had been present at the May 15, 2020 incident. The defense responded that the remaining issues for the jury—including the assault and battery claim and the issues of causation and damages on the § 1983 excessive-force claim—required testimony about those events. In view of the State's intention to indemnify Williams on the claims against her, and in order to simplify the proof, Gregory then voluntarily dismissed the assault and battery claim. In ruling on this dispute about the officers' testimony, the district court acknowledged that, in the earlier written sanctions order, the court had "not specifically sa[id] that [it] would not allow testimony of officers about the incident." But to enforce the sanctions awarded, and in light of the dismissal

of the assault and battery claim against Williams, the court held that the officers would not be allowed to testify about what they saw during the actual "engagement" between Williams and Gregory.  They could, however, testify about "what Ms. Gregory was doing after the encounter," and the defense could also address causation by relying upon Gregory's medical records.

However, the witnesses at trial did not succeed in staying within the lines that the court had drawn.  As a result, at the conclusion of the testimony, Gregory asked the court to play Bye's cellphone recording for the jury.  Over the defense's objection, the court agreed to do so.  The court first instructed the jury that, because the State had failed to preserve the video, the jury was permitted, but not required, to infer "that the lost surveillance [footage] would have been favorable to [Gregory]."  The cellphone recording was then played to the jury, and that concluded the parties' presentation of the evidence.

The court's subsequent jury instructions told the jury that "it has been established as a matter of law that Defendant Williams used excessive force against [Gregory] in violation of the Fourth Amendment of the United States Constitution during their encounter on May 15, 2020."  During its deliberations, a juror sent a note to the court asking it to state "[w]hat during the altercation determined that Tomeka used excessive force."  The court responded that the jury "need not evaluate the evidence bearing on this issue" and that it had "been determined, as a matter of law, [that] Tomeka Williams used excessive force against [Gregory] on May 15th of 2020."

In its ensuing verdict, the jury awarded Gregory $75,000 in damages for her excessive-force claim against Williams,

but it determined that Williams had not acted with malice. The jury rendered a defense verdict on Gregory's sole remaining claim against the State, which was for negligent infliction of emotional distress. Gregory thereafter moved for attorneys' fees and costs under 42 U.S.C. § 1988. While that motion was still pending, judgment was entered on the jury's verdict on May 6, 2022. On May 20, 2022, Williams moved to amend the judgment to reduce the monetary award in light of Gregory's settlement with Fisher and the City, which Williams claimed should result in an offset.

In an August 3, 2022 ruling, the district court denied Williams's motion to reduce the judgment and granted Gregory's motion for attorneys' fees. Appellants timely appealed from the judgment on August 19, 2022.[3] We have jurisdiction under 28 U.S.C. § 1291.[4]

## II

We review a district court's imposition of sanctions for abuse of discretion. *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 957–58 (9th Cir. 2006). Whether the district court applied the correct legal standards in imposing sanctions raises a

---

[3] Appellants contend that their appeal was timely because, on June 6, 2022, the district court granted their motion to extend the time to appeal until "30 days from entry of the order disposing" of the pending motions to reduce the judgment and to award attorneys' fees. This order, however, was unnecessary and irrelevant. Because Williams had filed a timely motion to amend the judgment to take account of an alleged offset, the time to appeal did not begin to run until that motion was denied on August 3, 2022. *See* FED. R. APP. P. 4(a)(4)(A)(iv).

[4] Although the jury ruled for the State on the sole remaining claim against it, the State has standing to appeal the resulting judgment against Williams in light of the fact that the adverse written sanctions orders that resulted in that judgment were issued against the State. Gregory has not challenged the State's standing to appeal in this court.

question of law that we review de novo. *Fjelstad v. American Honda Motor Co.*, 762 F.2d 1334, 1337 (9th Cir. 1985). An "[a]pplication of the wrong legal standard" by the district court automatically "constitutes an abuse of discretion." *United States v. Ruiz*, 257 F.3d 1030, 1033 (9th Cir. 2001) (en banc). We review any underlying factual findings, including any findings concerning "bad faith and prejudice," only for clear error. *Leon*, 464 F.3d at 958.

Applying these standards, we conclude that the district court committed legal error by relying on its inherent authority in imposing the sanctions that it did rather than applying the provisions of Rule 37(e). We further conclude that, in light of the district court's factual findings, which are not clearly erroneous, the requirements for imposing such sanctions under Rule 37 were not met. And because the sanctions imposed were obviously prejudicial to Williams, we reverse the adverse judgment against her on the § 1983 excessive-force claim and remand for a new trial on that claim.

## A

Well before the promulgation of the Federal Rules of Civil Procedure in 1937, the Supreme Court had recognized that federal courts have inherent authority to "impose . . . submission to their lawful mandates." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991) (quoting *Anderson v. Dunn*, 19 U.S. 204, 227 (1821)). Such "inherent powers" include the "discretion . . . to fashion an appropriate sanction for conduct which abuses the judicial process." *Id*. at 44–45. This inherent authority often remains available as an alternative source of sanctioning power even when there are statutes or rules that also provide for sanctions. *See id*. at 42–43. Thus, for example, in *Chambers*, the Court held that

the express authority to impose attorneys' fees as a sanction under 28 U.S.C. § 1927 and the Federal Rules of Civil Procedure did not preclude a district court from relying on its inherent authority in imposing such fees as a sanction for bad-faith litigation conduct. *Chambers*, 501 U.S. at 46–51.

However, the Court has also held that "the exercise of the inherent power of lower federal courts can be *limited* by statute and rule, for these courts were created by act of Congress." *Id*. at 47 (emphasis added) (simplified). Accordingly, a court may not invoke inherent authority in order to contravene the "clear mandate" of an applicable statute or rule. *Id*. at 51 (citing *Bank of Nova Scotia v. United States*, 487 U.S. 250, 254–55 (1988)); *see also Atchison, Topeka & Santa Fe Ry. Co. v. Hercules Inc.*, 146 F.3d 1071, 1074 (9th Cir. 1998). "Nevertheless, '[the courts] do not lightly assume that Congress has intended to depart from established principles' such as the scope of a court's inherent power." *Chambers*, 501 U.S. at 47 (citation omitted).

Appellants contend that Rule 37(e) exclusively governs the availability of the sort of sanctions that were imposed for the loss of evidence that occurred here and that, as a result, the district court erred by relying on its inherent authority. In evaluating this contention, we begin with the language of the rule.

As amended in 2015, Rule 37(e) provides:

> If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or

replaced through additional discovery, the court:

(1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or

(2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:

(A) presume that the lost information was unfavorable to the party;

(B) instruct the jury that it may or must presume the information was unfavorable to the party; or

(C) dismiss the action or enter a default judgment.

FED. R. CIV. P. 37(e). By its terms, the rule states that, if a specified loss of "electronically stored information" occurs, then the court "may" impose certain sanctions upon making the findings required, respectively, under paragraph (1) or paragraph (2). To determine whether this rule might be applicable here in a way that precludes reliance on inherent authority, we first consider whether this case involves the sort of information loss that is covered by the rule.

Gregory's own expert acknowledged that the surveillance system used by the State to record the Probation Office parking lot was a digital system that was operated using a computer and software. The video footage at issue in this case thus readily qualifies as "electronically stored

information" within the meaning of the Federal Rules of Civil Procedure. *See Leonard v. St. Charles Cnty. Police Dep't*, 59 F.4th 355, 364 (8th Cir. 2023); *Wall v. Rasnick*, 42 F.4th 214, 221–23 (4th Cir. 2022). We also have little difficulty concluding that the footage at issue here "should have been preserved in the anticipation or conduct of litigation." Fed. R. Civ. P. 37(e). The State had actual knowledge of its obligation to preserve the footage in connection with Williams's misdemeanor criminal case, and it was certainly foreseeable that civil litigation could arise from the disputed incident as well. We further reject, as wholly unpersuasive, the State's contention that it took "reasonable steps to preserve" the footage from being "lost." In particular, failing to promptly determine how long the surveillance system preserved its information was unreasonable, as was failing to proceed with appropriate dispatch in taking the actual steps necessary to download the video from the system before it was deleted. And the State's actions in making a poor-quality, second-level copy did not satisfy its obligation to take reasonable steps to preserve the information. Furthermore, it is undisputed that the footage here could not "be restored or replaced through additional discovery." *Id*. Thus, all of the conditions that are required to trigger Rule 37(e) were satisfied here: "electronically stored information that should have been preserved in the anticipation or conduct of litigation [wa]s lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery." *Id*.

The text of Rule 37(e) then specifies that, when such a covered loss of information occurs, the court must make the specified findings required by paragraphs (1) or (2) before it may impose a sanction, and those paragraphs require

different findings depending upon the nature and severity of the sanction. Paragraph (1) sets forth a general authority, "upon [a] finding of prejudice to another party from loss of the information," to impose remedial sanctions that are "no greater than necessary to cure the prejudice" resulting from the loss. FED. R. CIV. P. 37(e)(1). Paragraph (2), however, establishes a more demanding standard before the court may impose certain types of severe sanctions. Such sanctions, the rule states, may be imposed "*only* upon finding that the party [who caused the loss] acted with the *intent* to deprive another party of the information's use in the litigation." FED. R. CIV. P. 37(e)(2) (emphasis added).

The severe sanctions that are subject to paragraph (2)'s more demanding standard are: (1) "presum[ing] that the lost information was unfavorable to the party" that caused the loss; (2) "instruct[ing] the jury that it may or must presume the information was unfavorable to th[at] party"; or (3) "dismiss[ing] the action or enter[ing] a default judgment." FED. R. CIV. P. 37(e)(2)(A)–(C). The advisory committee notes that accompanied the adoption of the amended Rule 37(e) in 2015 explicitly confirm an important point that its text already suggests, namely, that any *more* severe sanction that rests on one of the sanctions listed in paragraph (2), and that has the same effect as such a sanction, is subject to paragraph (2). *See* FED. R. CIV. P. 37(e)(1) advisory committee's note to 2015 amendment ("Care must be taken . . . to ensure that curative measures under subdivision (e)(1) do not have the effect of measures that are permitted under subdivision (e)(2) only on a finding of intent to deprive another party of the lost information's use in the

litigation.").[5]  Thus, for example, a sanction "precluding a party from offering any evidence in support of[] the central or only claim or defense in the case" effectively rests on a conclusive presumption that the lost information was unfavorable to that party and simply implements that implicit presumption in an even more severe form.  *Id.*

Here, the sanctions selected by the district court fall within the scope of paragraph (2) of Rule 37(e).  The district court's order instructing the jury to take as established that Williams had used excessive force in violation of the Fourth Amendment was simply a more severe form of the sort of presumptions covered by Rule 37(e)(2).  Indeed, the instruction was effectively a conclusive presumption that the lost video was so unfavorable to the State on the issue of excessive force that that ultimate fact at issue should be taken as resolved in Gregory's favor.  *See* FED. R. CIV. P. 37(e)(2)(A), (B).[6]  Moreover, the district court's subsequent further instruction to the jury—when the cellphone copy of the footage was introduced—that the jury could infer "that the lost surveillance [footage] would have been favorable to [Gregory]" falls squarely within the language of Rule 37(e)(2)(B).  Accordingly, under the plain language of Rule 37(e)(2), these sanctions were "only" available if the court first made the finding of intent required by the rule. FED. R. CIV. P. 37(e)(2).

---

[5] As the Supreme Court has stated, "the Advisory Committee Notes provide a reliable source of insight into the meaning of a rule, especially when, as here, the rule was enacted precisely as the Advisory Committee proposed." *United States v. Vonn*, 535 U.S. 55, 64 n.6 (2002).

[6] Strictly speaking, the relevant subparagraph on this point would be subparagraph (2)(A), because it was the *court* that conclusively presumed that the lost video was unfavorable when it decided to instruct the jury that Williams's use of excessive force had been established.

Given Rule 37(e)'s careful specification of the findings that *must* be made before any sanction may be imposed for a covered loss of information, it is clear that the rule, by its terms, precludes a court from resorting to inherent authority to evade its strictures. Indeed, the advisory committee notes confirm that this effect of the rule's language was intentional. The committee stated that, because the rule "authorizes and specifies measures a court may employ if information that should have been preserved is lost, and specifies the findings necessary to justify these measures," the rule "*forecloses reliance on inherent authority* or state law to determine when certain measures should be used." FED. R. CIV. P. 37(e) advisory committee's note to 2015 amendment (emphasis added). That is especially true here, given that the rule specifically states that the particular sanctions that the district court selected may "only" be imposed if the court first makes the specific finding of intent required by that rule. FED. R. CIV. P. 37(e)(2).

Because Rule 37(e) governs both the loss of information and the sanctions imposed in this case, and because the rule's specific requirements preclude invocation of a court's inherent authority, the district court erred as a matter of law by relying upon its inherent authority rather than applying Rule 37(e). *See Chambers*, 501 U.S. at 51 (stating that courts may not rely on inherent authority to "circumvent[] the clear mandate of a procedural rule"); *cf. Jones v. Riot Hosp. Grp. LLC*, 95 F.4th 730, 735 (9th Cir. 2024) (holding that, when Rule 37(e)(2) applies, its standards govern rather than the standards applicable under the court's inherent authority (citing *Anheuser-Busch, Inc. v. Natural Beverage Distribs.*, 69 F.3d 337, 348 (9th Cir. 1995) (describing standards applicable to sanctions "pursuant to the court's inherent power"))).

**B**

Although the district court thus invoked the wrong source of legal authority in imposing the sanctions that it did, its error on that score would be harmless if the record reflects that the district court did in fact make the findings that are required by Rule 37(e)(2).  Here, the record confirms that the opposite is true.

As we have explained, Rule 37(e)(2) states that, before the court may impose one of the listed sanctions, it must first find that "the party"—meaning the "party" who "failed to take reasonable steps to preserve" the information—"acted with the intent to deprive another party of the information's use in the litigation."  FED. R. CIV. P. 37(e)(2).  On its face, that is a demanding specific-intent standard, and purposely so.  The advisory committee notes confirm that the amended rule was specifically intended to abrogate "cases such as *Residential Funding Corp. v. DeGeorge Financial Corp.*, 306 F.3d 99 (2d Cir. 2002), that authorize the giving of adverse-inference instructions on a finding of negligence or gross negligence."   FED. R. CIV. P. 37(e)(2) advisory committee's note to 2015 amendment.

We have held that the intent required by Rule 37(e)(2) "is most naturally understood as involving the willful destruction of evidence with the purpose of avoiding its discovery by an adverse party."  *Jones*, 95 F.4th at 735 (citing *Skanska USA Civ. SE Inc. v. Bagelheads, Inc.*, 75 F.4th 1290, 1312 (11th Cir. 2023) (stating that Rule 37(e)(2) requires finding "*purpose of hiding* adverse evidence" (citation omitted))).  The district court did not find any such intent, either on the part of the State or any of its agents, including Williams.  On the contrary, the district court specifically rejected even Gregory's lesser argument that the

loss of the footage resulted from "gross negligence on the part of the State and its employees" and found that "Gregory cannot sustain her burden to establish gross negligence or *willfulness* on the part of the State" (emphasis added). That finding, which is not clearly erroneous, necessarily precludes any finding that the State or Williams acted with the specific intent that we described in *Jones* and that is required by Rule 37(e)(2). The district court found only that the State's actions amounted to "recklessness," but that is not enough to authorize the severe sanctions covered by Rule 37(e)(2) and imposed by the district court here.

Accordingly, we conclude that Rule 37(e)(2) precluded the district court from imposing the sanctions that it did.

## C

Because the district court erroneously imposed a sanction that severely limited Williams's ability to present a defense to the § 1983 claim, the district court's error was obviously prejudicial to Williams. The resulting verdict and judgment on that claim must therefore be set aside, and the matter must be remanded for a new trial on that claim. *See Liberty Ins. Corp. v. Brodeur*, 41 F.4th 1185, 1191–93 (9th Cir. 2022) (reversing Rule 37(c)(1) sanctions and remanding for a new bench trial where the erroneous sanctions order determined the outcome of the original bench trial). Accordingly, we reverse the district court's sanctions orders and the verdict and judgment on the § 1983 excessive-force claim, we vacate the district court's award of attorneys' fees to Gregory, and we remand for a new trial on the excessive-force claim.

**REVERSED AND REMANDED.**